Slip Op. 18-140

UNITED STATES COURT OF INTERNATIONAL TRADE

GUIZHOU TYRE CO., LTD., GUIZHOU TYRE
IMPORT AND EXPORT CO., LTD, AND
XUZHOU XUGONG TYRES CO., LTD.,

               Plaintiffs,

and

TIAJIN UNITED TIRE AND RUBBER
INTERNATIONAL CO., LTD.,

               Plaintiff-Intervenor,

v.

UNITED STATES,

               Defendant.

Before: Richard W. Goldberg, Senior Judge
Consolidated Court No. 17-00101

**OPINION AND ORDER**

[Sustaining in part and remanding in part the determinations of the Department of Commerce.]

Dated:  October 17, 2018

*Ned H. Marshak* & *Andrew T. Schutz*, Grunfeld Desiderio Lebowitz Silverman &
Klestadt, LLP, of New York, NY, and *Richard P. Ferrin* & *Douglas J. Heffner*, Drinker Biddle
& Reath, LLP, of Washington, D.C., for plaintiffs.

*John Tudor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Chad A.
Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E.
White, Jr.*, Assistant Director. Of counsel on the brief was *Emma T. Hunter*, Office of the Chief
Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of
Washington, D.C.

*Mark B. Lehnardt*, Baker Hostetler, LLP, of Washington, D.C., for plaintiff-intervenor.

Goldberg, Senior Judge:  This action arises from a challenge by plaintiffs, Guizhou Tyre

Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., (collectively, "Guizhou" or "GTC"),

consolidated plaintiff Xuzhou Xugong Tyres Co., Ltd., ("Xugong"), and intervenor-plaintiff

Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC") (collectively "Plaintiffs") to

certain aspects of the final results published by the Department of Commerce ("the Department"

or "Commerce") of the underlying administrative review of the countervailing duty order on off-

the-road tires ("OTR tires") from the People's Republic of China ("PRC").  *Certain New*

*Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,285 (Dep't

Commerce Apr. 18, 2017) (final results), *amended by Certain New Pneumatic Off-the-Road*

*Tires from the People's Republic of China,* 82 Fed. Reg. 40,554 (Dep't Commerce Aug. 25,

2017) (am. final results) ("*Amended Final Results*").  Plaintiffs have filed summary judgment

motions, Pls'. Mot. for J. on Agency R., ECF No. 63 (Jan. 5, 2018) ("Pls.' Br."), challenging

Commerce's *Amended Final Results* with respect to: (1) Commerce's use of an adverse

inference—and subsequent application of an adverse rate—in determining use of the China

Export-Import Bank's Export Buyer's Credit program; (2) various aspects of the benchmarks

used in calculating the benefits associated with several programs for less than adequate

remuneration; and (3) Commerce's decision to countervail the Import Duty Exemption For

Imported Raw Materials Program.  Xugong filed a separate motion for judgment on the

pleadings, Xugong Mot. for J. on Agency R., ECF No. 62 (Jan. 5, 2018) ("Xugong Br."), and

TUTRIC has adopted and incorporated the challenges brought by both Guizhou and Xugong,

TUTRIC Mot. for J. on Agency R., ECF No. 64 (Jan. 5, 2018).

For the reasons discussed below, the court remands the Department's findings with

respect to the adverse inference applied to the Expert Buyer's Credit program, remands and

sustains in part the Department's benchmark calculations, and sustains the Department's decision

to countervail the Import Duty Exemption for Imported Raw Materials Program.

## BACKGROUND

On November 9, 2015, Commerce initiated a review of the countervailing duty order on

certain OTR tires from the PRC based upon timely requests from interested parties during the

period of review between January 1, 2014 and December 31, 2014.  *Antidumping and*

*Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Dep't Commerce Nov. 9,

2015) (initiation).  On February 3, 2016, Commerce selected Guizhou and Xugong as mandatory

respondents.  Resp't Selection Mem., Joint Appendix, ECF No. 79 ("J.A.") Tab 2 (Jan. 29,

2016).  Both parties, as well as the Government of China ("GOC"), responded to the

Department's initial and supplemental questionnaires.  GOC Initial Questionnaire Resp., J.A.

Tab 4 (Apr. 13, 2016) ("GOC Initial Questionnaire Resp."); GTC Initial Questionnaire Resp.,

J.A. Tab 5 (Apr. 19, 2016) ("GTC Initial Questionnaire Resp."); GOC New Subsidy Allegations

("NSA") Questionnaire Resp., J.A. Tab 15 (Aug. 19, 2016) ("GOC NSA Questionnaire Resp.");

GTC NSA Questionnaire Resp., J.A. Tab 14 (Aug. 19, 2016) ("GTC NSA Questionnaire

Resp."); GTC First Supp. Resp., J.A. Tab 13 (Aug. 19, 2016) ("GTC First Supp. Resp.").

On October 14, 2016, Commerce issued its preliminary results from the administrative

review based on the parties' questionnaire responses.  *Certain New Pneumatic Off-the-Road*

*Tires From the People's Republic of China*, 81 Fed. Reg. 71,056 (Dep't Commerce Oct. 14,

2016) (prelim. results) ("*Preliminary Results*") and accompanying Prelim. Decision Mem., J.A.

Tab 25 (Oct. 5, 2016) ("PDM").  In its preliminary findings, the Department determined that (1)

the GOC failed to provide answers regarding the China Export-Import Bank Buyer's Credit

Program, PDM at 14; (2) Guizhou and Xugong benefited from the provision of certain inputs at

less-than-adequate remuneration, using Tier 2 benchmark measurements for carbon black and

nylon cord, and Tier 1 benchmark measurements for the import prices of natural and synthetic

rubber, *id*. at 22; and (3) the import duty and value added tax (VAT) exemptions on imports of

raw materials were countervailable subsidies, *id*. at 35.  Commerce determined that because the

GOC failed to provide responses to a series of questions related to the Export Buyer's Credit

Program—countering the GOC's allegation of non-use—the Department was permitted to apply

an adverse inference in selecting from the facts otherwise available that Guizhou and Xugong

used and benefited from the program.  *Id*. at 38.

The Department's final decision largely echoed its preliminary findings.  *Certain New*

*Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,285 (Dep't

Commerce Apr. 18, 2017) (final results) ("*Final Results*") and accompanying Issues & Decision

Mem., J.A. Tab 33 (Apr. 12, 2017) ("I&D Mem.").  Commerce continued to include ocean and

inland freight delivery charges and added import duty and VAT payments into the benchmark

prices, despite Guizhou's position that these duties should not be included because it does not

pay import duties or VAT on imported inputs.  I&D Mem. at 9.  As a result, the Department

found a 34.46 percent *ad valorem* countervailable subsidy rate for Guizhou, and a 46.01 percent

subsidy rate for Xugong.  *Id*.  Later, the Department issued a memorandum, amending the *Final*

*Results* to include quarterly *synthetic* rubber benchmark data, as submitted by petitioners,

following the Department's initial error in using figures for *natural* rubber benchmarks.

Ministerial Error Mem., J.A. Tab 38 (Aug. 21, 2017) ("Ministerial Error Mem.").  The amended

final results were published on August 25, 2017.  *See generally Amended Final Results*.

Plaintiffs' motion for judgment followed, challenging Commerce's *Amended Final*

*Results* with respect to: (1) Commerce's use of an adverse inference in selecting from among the

facts available in determining use of the China Export-Import Bank's Export Buyer's Credit

program by both Xugong and Guizhou; (2) Commerce's selection of the adverse rate applied to

the Export Buyer's Credit program; (3) various aspects of the benchmarks used in calculating the

benefits associated with several programs for less than adequate remuneration, including nylon

cord, synthetic rubber, and carbon black; and (4) Commerce's decision to countervail the Import

Duty Exemption For Imported Raw Materials Program.  Pls.' Br.  Xugong filed a separate

motion for judgment on the pleadings.  Xugong Br.  For the reasons discussed below, the court

sustains in part and remands in part Commerce's *Amended Final Results*.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).  The court

will sustain Commerce's determination unless the court concludes that the determination is

"unsupported by substantial evidence on the record, or otherwise not in accordance with

law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence amounts to "more than a mere

scintilla" of evidence.  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951).  It is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Id.*  In other words, "substantial evidence" "can be translated roughly to mean 'is [the

determination] unreasonable?'"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed.

Cir. 2006).

## DISCUSSION

Plaintiffs raise challenges to the Department's determinations regarding: (1) China's

Export-Import Bank Buyer's Credit Program; (2) the Department's calculation of benchmarks

measuring adequate remuneration for synthetic rubber, carbon black, and nylon cord; (3) China's

VAT and Import Duty Exemption for Imported Raw Materials Program as a countervailing

subsidy; and (4) the rate calculations formulated for the VAT aspect of the VAT and Import

Duty Exemption for Imported Raw Materials Program.  The court sustains Commerce's decision

to countervail the VAT and Import Duty Exemption for Imported Raw Materials Program.  For

the remaining issues raised by plaintiffs, the court remands in part, pursuant to the below.

## I.    China Export Import Bank Buyer's Credit Program

In its review, Commerce examined whether Plaintiffs potentially benefited from China's

Export Buyer's Credit Program (the "Program"), which provides loans to foreign companies to

promote the export of Chinese goods.  *See Antidumping and Countervailing Duty Administrative

Reviews*, 80 Fed. Reg. 69,193 (Dep't Commerce Nov. 9, 2015) (initiation).  Commerce issued

two questionnaires to the respondents, both seeking information regarding the Program.

Commerce NSA Questionnaire to Xugong, J.A. Tab 9 (July 26, 2016); Commerce NSA

Questionnaire to GOC, J.A. Tab 10 (July 26, 2016); Commerce NSA Questionnaire to Guizhou,

J.A. Tab 12 (July 26, 2016).  Plaintiffs each responded that none of their relevant customers used

the Program.  GOC NSA Questionnaire Resp. at 22; GTC NSA Questionnaire Resp. at 14.  For

its part, the GOC declined to provide questionnaire responses concerning the operation of the

Program.  As a result of the GOC's failure to cooperate, Commerce determined that Xugong and

Guizhou benefitted from the Program.  I&D Mem. at 23.

Pursuant to 19 U.S.C. § 1677e, the U.S. Department of Commerce ("Commerce") may

select from facts otherwise available when a party to a proceeding: (A) withholds information

that is requested; (B) fails to provide such information in the form and manner requested; (C)

significantly impedes a proceeding; or (D) provides information which cannot be verified.  *See*

19 U.S.C. § 1677e(a)(2).  Further, Commerce may select from the facts available in a manner

adverse to the respondent if the gap in the record was caused by the failure of the respondent to

cooperate to the best of its ability.  19 U.S.C. § 1677e(b).  Compliance with the "best of its

ability" standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. *See Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003). Therefore, Commerce can apply adverse facts available ("AFA") only when it has first made a supported finding under §1677e(a) that information is missing from the record for an enumerated reason, followed by a separate finding under § 1677e(b) that there has been a failure to cooperate.

The court finds that Commerce applied AFA without substantial evidence to support the requisite threshold finding that there was a gap in the record warranting the use of facts available. Commerce determined that the GOC failed to comply, to the best of its ability, with Commerce's request for information regarding an amendment to the operation of the Program and thus, the use of an adverse inference was warranted under 19 U.S.C § 1677e(b)(1). Crucially missing from this assessment is an initial finding by Commerce that material information was missing from the record. While the Department did note that information as to the functioning of the Program was missing, this finding was rendered immaterial by responses from both Guizhou and the GOC as to the Program's use. This defect proves fatal to Commerce's imposition of AFA.

Generally, while respondent companies will have "information pertaining to the existence and amount of the benefit conferred by the program," "foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs." *Archer Daniels Midland Co. v. United States*, 37 CIT __, __, 917 F. Supp. 2d 1331, 1342 (2013). When a foreign government fails to respond to the best of its ability, Commerce will typically find that the government provided a financial contribution to a specific industry. *Id.* When the application of AFA under such circumstances may adversely impact a cooperating party,

however, Commerce should seek to avoid such impact if, as is the case here, relevant

information exists elsewhere on the record.  *Id.*   To apply AFA in circumstances where relevant

information exists elsewhere on the record—that is, solely to deter non-cooperation or "simply to

punish"—would make the agency's determination based on an incomplete (and therefore,

inaccurate) account of the record; that is a fate this court should sidestep.  *See Changzhou Trina*

*Solar Energy Co. v. United States*, 41 CIT __, __, 255 F. Supp. 3d 1312, 1319 (2017) (sustaining

Commerce's decision to refrain from using AFA where information existed elsewhere on the

record because to do otherwise would "apply AFA for no reason other than to deter the GOC's

non-cooperation in future proceedings . . . .").

Although GOC failed to fully respond to Commerce's requests for information, this

failure did not create the requisite gap needed to make an adverse inference.  Regardless of

GOC's questionnaire responses to several questions posed by Commerce, GOC unequivocally

stated that the respondents' customers did not use the Export Buyers Credit Program.  There is

no ambiguity or uncertainty surrounding the use of the Program by Plaintiffs or their customers,

as this information consisted of signed declarations from Plaintiffs' U.S. customers certifying

non-use, and is corroborated by GOC's statements.  *See* GTC NSA Questionnaire Resp. at 13–

14.  Therefore, the only gap of information on the record are facts regarding certain aspects of

the *operation* of the Program.  In turn, the only factual issues potentially appropriate for facts

otherwise available, § 1677e(a), and adverse inferences, § 1677e(b), are those that concern the

operation of the Program, factors entirely irrelevant to Guizhou's apparent non-use.

Although Commerce possessed declarations covering Plaintiffs' affiliated and

unaffiliated customers in the United States, Commerce declined to consider these declarations,

thereby abandoning its long-standing practice.  *See Certain In-shell Roasted Pistachios from the*

*Islamic Republic of Iran*, 73 Fed. Reg. 9993 (Feb. 25, 2008) (final results) and accompanying

Issues & Decision Mem. cmt. 2 (explaining that in instances where the foreign government fails

to adequately respond to Commerce's questionnaires, Commerce must "calculate[] the benefit by

relying, to the extent possible, on information supplied by the respondent firm.").  Commerce's

argument that because it lacked a "complete and verifiable understanding of the program's

operation, especially with regard to the involvement of third-party banks, the information

provided by [the] respondents is [] unverifiable," I&D Mem. at 24, is without merit, because

Commerce improperly conflates the program's operation with its use.  Plaintiffs have knowledge

of their own usage of this program, however it operates, and certified its non-use by its

customers.  Commerce's obligation when drawing an adverse inference based on a lack of

cooperation by a foreign government is to avoid collaterally impacting respondents to the extent

practicable by examining the record for replacement information.

In sum, Commerce had a clear path to find non-use by either accepting the declarations

submitted by Plaintiffs and their U.S. customers or by verifying these declarations.  Instead,

Commerce has chosen a more convoluted route in substituting facts derived from the record with

its own unsupported conclusions.  Such a determination cannot be sustained by the court.

## II.      The AFA Rate for the Buyer's Credit Program

Having concluded that Commerce inappropriately applied AFA without substantial

evidence to support the requisite threshold finding that there was a gap in the record warranting

the use of AFA, the Department's application of an adverse countervailing subsidy rate of 10.54

percent *ad valorem* is rendered moot.[1]  In any event, the court notes that the Department

---

[1] The Department also argues that Guizhou failed to exhaust its administrative remedies with
respect to the adverse rate of 10.54 percent applied to the Export Buyer's Credit Program.  Def.'s
Resp. to Pls.' Mot. for J. on Agency R. 25, ECF No. 71 (May 25, 2018).  This argument is also
rendered moot by the court's remanding the Department's use of AFA for the Buyer's Credit

improperly applied its regulatory hierarchy for the selection of rates for the Buyer's Credit

Program.  As it stands, the Department's explanation of its application of the rate hierarchy is

lacking.  Commerce has explained its AFA rate selection hierarchy as follows:

> Consistent with section 776(d) of the Act and our established practice, we selected the highest calculated rate for the same or similar program as AFA. When selecting rates in an administrative review, we first determine if there is an identical program from any segment of the proceeding and use the highest calculated rate for the identical program (excluding *de minimis* rates). If no such identical program exists, we then determine if there is a similar/comparable program (based on the treatment of the benefit) within the same proceeding and apply the highest calculated rate for the similar/comparable program, excluding *de minimis* rates. Where there is no comparable program, we apply the highest calculated rate from any non-company specific program in any CVD case involving the same country, but we do not use a rate from a program if the industry in the proceeding cannot use that program. We are using an AFA rate of 10.54 percent *ad valorem*, the highest rate determined for a similar program in the *Coated Paper from the PRC* proceeding, as the rate for these companies.

PDM at 14 (footnotes omitted).

The Government claims that "Commerce determined that there were no calculated rates

for the Export Buyer's Credit program in the proceeding—and, thus, no rates were available to

Commerce under step one or step two of its review hierarchy."  Def.'s Resp. to Pls.' Mot. for J.

on Agency R. 30, ECF No. 71 (May 25, 2018) ("Def.'s Br.").  However, step two calls upon

Commerce to apply the highest calculated rate for a *similar* program (determined by the type of

benefit) from any segment within the same proceeding.  I&D Mem. at 14.  Commerce apparently

did not seek out a rate from a *similar* program in the same proceeding (as required pursuant to

the hierarchy) before moving immediately—and inexplicably—to step three upon determining

that there was no rate for the *identical* program.  On remand, Commerce is encouraged to take a

---

Program.  However, despite failing to specifically rebut the 10.54 percent adverse rate ultimately applied by Commerce, Guizhou implicitly raised objections to the AFA rate when it raised evidence of non-use on the record and disputed the application of an AFA rate generally. GTC Admin. Case Br. 18, J.A. Tab 27 (Dec. 12, 2016).

closer look at the regulation it depends upon, in order to issue a supported and reasoned

determination based on—if necessary—the highest *de minimis* calculated rate from a similar

program in the same proceeding.

### III.   Calculation of Tier 2 Benchmarks

Plaintiffs raise several challenges to the Department's calculation of benchmarks

measuring whether adequate remuneration was paid for synthetic rubber, carbon black, and

nylon cord.  Specifically, Xugong argues that Commerce's use of quarterly—rather than

monthly—data to measure synthetic rubber benchmark prices was in error, Xugong Br. at 10;

and Guizhou argues that neither VAT nor ocean freight inputs should have been added to the

benchmark calculations, Pls.' Br. at 40.  Because Commerce used a Tier 2 benchmark for

synthetic rubber and carbon black, the Department's decision to include VAT and import duties

in its benchmark analyses—based on quarterly data—was reasonable and supported by

substantial evidence.  However, the court cannot support the Department's decision to include

ocean freight charges in its Tier 1 benchmark calculation for nylon cord.  On remand for further

consideration, the court orders Commerce to carefully—and in its totality—review the evidence

submitted by the plaintiffs to determine whether Chinese import statistics are already freight

inclusive, thereby rendering the inclusion of ocean freight data in its benchmark calculation

entirely duplicative.

### A.   Legal Framework

A countervailable subsidy exists where (1) a financial contribution is provided, (2) a

benefit is thus conferred, and (3) the subsidy is specific.  *See* 19 U.S.C. § 1677(5).  When a

financial contribution is provided through goods or services, the statute defines a benefit as

arising where goods or services "are provided for less than adequate remuneration."  19 U.S.C.

§ 1677(5)(E)(iv).  The adequacy of remuneration "shall be determined in relation to prevailing

market conditions for the good or service being provided" in the country that is subject to review.  19 U.S.C. § 1677(5)(E).  Usual market conditions comprise of "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).

Commerce employs a hierarchical framework to measure the adequacy of remuneration. *See* 19 C.F.R. § 351.511.  First, by use of a "Tier 1" benchmark, Commerce typically compares the price the government sold the goods or service to the respondent with a market-determined price in the country in question.  19 C.F.R. § 351.511(a)(2)(i).  In contrast, a "Tier 2" benchmark, employed when market prices are not accessible, allows Commerce to "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511 (a)(2)(ii).  If a world market price cannot be used, then Commerce will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  This is a "Tier 3" benchmark.  *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 CIT __, __, 929 F. Supp. 2d 1324, 1327 (2013) (concluding that Commerce's decision to use Tier 2 "world market" pricing only after determining that Tier 1 pricing is "unusable" is part of a "reasonable benchmark" calculation and "is well grounded in the applicable regulations.").

Here, Commerce used a Tier 2 benchmark.  No party disputes that determination. Therefore, Commerce was required to "adopt[] the world market price as a benchmark or proxy for the price in the producer's home country," and if the record presented more than one viable world market price, Commerce was required to average the prices as permitted, considering factors such as "price, quality, availability, marketability, transportation, and other conditions of

purchase or sale." *RZBC Grp. Shareholding Co. v. United States*, 39 CIT __, ___, 100 F. Supp. 3d 1288, 1304 (2015) (citing 19 U.S.C. § 1677(5)(E)).

### B. Quarterly Data

Commerce used quarterly Tier 2 benchmark data submitted by petitioners for synthetic rubber in determining Xugong's and Guizhou's subsidy rates.  Ministerial Error Mem. at 4. Xugong argues that monthly benchmark data provided by Guizhou is more appropriate.  In the *Final Results*, Commerce also included VAT, import duties, and ocean freight costs in its Tier 2 benchmark calculations of nylon cord, carbon black, and synthetic rubber.  I&D Mem. at 9–15. Xugong argues that Commerce's use of quarterly benchmark data, when alternative monthly data is available, conflicts with Commerce's past practice.  Xugong Br. at 10.  Nevertheless, Xugong relies on a prior review that explicitly states the opposite.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't Commerce July 19, 2016) (final results) and accompanying Issues & Decision Mem. cmt. 6 ("The factors relied upon by the Department when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a *case-by-case* basis." (emphasis added)).

The court's role is not to assess whether the benchmark data Commerce used was the "best available," but rather whether Commerce's choice was reasonable.  *Peer Bearing Company-Changshan v. United States*, 27 CIT 1763, 1770, 298 F. Supp. 2d 1328, 1336 (2003). The Department's "reasoned analysis or explanation for [its] decision," then, determines "whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369 (Fed. Cir. 1998).

As illustrated by the regulatory hierarchy, Commerce prefers to derive a benchmark to measure adequacy of remuneration for an input from "a market-determined price for the good . . . resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). After a reevaluation of its *Preliminary Results*, which were based on Tier 1 calculations, Commerce determined that the Chinese synthetic rubber market was distorted, causing the prices from the Chinese market to be unusable. I&D Mem. at 13. As a result, Commerce opted instead to use a Tier 2 benchmark for measuring adequacy of remuneration from the provision of synthetic rubber. *Id*. at 13.

In selecting the Tier 2 benchmark, Commerce stated that it would use the monthly *synthetic* rubber prices provided by petitioners from the International Rubber Study Group Statistical Bulletin. *Id.* In its *Final Results*, Commerce erroneously used *natural* rubber benchmark data, which it then remedied in its *Amended Final Results*. *Amended Final Results* at 40,555. Commerce clarified that it had intended to use the Tier 2 synthetic rubber benchmark data submitted by petitioners from the International Rubber Study Group Statistical Bulletin. Ministerial Error Mem. at 3–4. The only synthetic rubber benchmark data provided by petitioners on the record are quarterly and annual data.

Xugong argues that Commerce's reliance on quarterly data is distortive. However, this argument is meritless, because no specific support was offered. In contrast, Commerce's decision is supported by a reasonable reading of record evidence. Therefore, this Court will not cast doubt on Commerce's reasonable selection of quarterly benchmark data, even though alternative data sets are available.

### C.  VAT and Import Duties

Commerce identified and included VAT and import duties in its Tier 2 benchmark

analysis of the less-than-adequate remuneration programs for synthetic rubber and carbon black,

claiming that such costs are required adjustments to a Tier 2 benchmark.  I&D Mem. at 10.

Guizhou argues that Commerce should not include VAT in its calculations because, as Guizhou

claims, it did not actually pay VAT upon import.  Pls.' Br. at 42.  Guizhou continues that

because VAT is not expressly enumerated in 19 C.F.R. § 351.511(a)(2)(iv) as a "delivery

charge[]" or an "import dut[y]," it does not fall within the class of adjustments that Commerce

would normally include.  *Id.*

The regulation provides that in measuring adequate remuneration, Commerce must adjust

the comparison price to reflect the price that a firm "actually paid or would pay if it imported the

product," including "delivery charges and import duties."  19 C.F.R. § 351.511(a)(2)(iv).

Although Commerce's regulations direct it to use the "delivered price" when calculating a

benchmark price, 19 C.F.R. § 351.511(a)(2)(iv), it is not "plainly erroneous or inconsistent with

the regulation" to "permit inclusion of expenses other than delivery charges and import duties in

benchmark calculations . . . ."  *Changzhou Trina Solar Energy Co. v. United States,* 41 CIT __,

__, 255 F. Supp. 3d 1312, 1325 (2017) (citing *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613

(2013)).  As this court has previously stated, the regulation's reference to a "firm" "refers to a

hypothetical firm located in the PRC" and the fact that *Plaintiffs* "might not pay the VAT or

import duties" is "irrelevant, given that a *firm* located in the PRC . . . would ordinarily have paid

these duties."  *Beijing Tianhai Indus. Co. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351,

1374 (2015).  Therefore, the inclusion of a VAT in the Department's Tier 2 calculation is

reasonable so long as a PRC firm would have ordinarily paid the duties.  Moreover, including

VAT in benchmark calculations generally falls in line with the court's prior decisions addressing

this particular charge.  *See Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 17-3, 2017

WL 218910, at *11 (CIT Jan. 19, 2017) ("Commerce properly interpreted 'other charges

imposed' to include 'costs,' and irrecoverable VAT is just such a cost."); *Jacobi Carbons AB v.*

*United States*, 41 CIT __, __, 222 F. Supp. 3d 1159, 1188 (2017) ("Accordingly, the Chinese

VAT is permissibly construed as an 'other charge' that is 'imposed by [China] upon the

exportation of the subject merchandise.'"); *Beijing Tianhai Indus. Co*., 39 CIT at __, 52 F. Supp.

3d at 1374 (permitting VAT calculation in a Tier 2 benchmark analysis because "a firm located

in the PRC that imported steel tube would ordinarily have paid these duties.").  Guizhou's

reference to Exhibit II.E.2—the GTC VAT and Import Tariff Exemptions Table for Imported

Materials, indicating that the "actual VAT paid" was 0, GTC First Supp. Resp. at 27—is overall

immaterial because, as Guizhou states, it demonstrates what GTC did pay, not what a

"hypothetical firm" in China *would* pay.

　　　Guizhou's arguments are, therefore, inapposite to the Department's espoused practices,

which this court has already appraised as a reasonable interpretation of 19 C.F.R. §

351.511(a)(2)(iv).  The court is not compelled to indulge in a drawn out interpretative analysis in

order to determine whether the agency had *intended* to include VAT in its calculations.  The

court's role is limited to ascertaining whether Commerce *reasonably* included VAT and import

duties in its benchmark calculations.  Here, the Federal Circuit has already previously

acknowledged that the inclusion of import charges not actually incurred by the parties in order to

calculate a Tier 2 benchmark price is still "consistent with the relevant statute and regulation"

because that is the prerogative of a "world market price" calculation.  *Essar Steel Ltd. v. United*

*States*, 678 F.3d 1268, 1274 (Fed. Cir. 2012).  The regulation itself "does not explicitly limit

adjustments to . . . the two [charges] listed;" and because the regulation mandates that Commerce

adjust the comparison price to reflect the price that a firm actually paid or would pay if it

imported the product, "[t]o interpret the regulation as requiring Commerce to adjust benchmark

prices *only* for delivery charges and import duties would render this mandate meaningless . . . ."

*Changzhou Trina Solar Energy Co.*, 255 F. Supp. 3d at 1325 (emphasis added).  Accordingly,

Commerce's determination was not a "plainly erroneous or inconsistent" application of 19

C.F.R. § 351.511(a)(2)(iv).

To that end, the Department did not act unreasonably when it included VAT and import

duties in its Tier 2 benchmark calculations for synthetic rubber and carbon black.  Commerce's

decision to add VAT and import duties to the benchmark prices is consistent with the relevant

statute and regulation and is supported by substantial evidence.

### D.  Ocean Freight

In its *Final Results*, the Department included ocean freight costs in its nylon cord Tier 1

benchmark calculations.  I&D Mem. at 10–13.  Guizhou argues that Commerce's addition of

ocean freight to the nylon cord benchmark was "unsupported by substantial evidence on the

record" because Chinese import statistics are "already freight inclusive."  Pls.' Br. at 43. Xugong

also disputed this inclusion, largely adopting Guizhou's position, and adding that the "GOC

argued that record evidence demonstrated that Chinese import statistics are reported on a CIF

basis."  Xugong Br. at 21.

As the Department acknowledges in its briefing, where Chinese import prices include

"cost, insurance, and freight" (CIF) prices, those charges already account for freight charges—

including ocean freight.  Def.'s Br. at 40.  The Government argues that Commerce did "not find

evidence on the record that indicated that the Chinese import statistics were reported on a CIF

basis." *Id*.  However, the record demonstrates that Guizhou submitted factual information for the

calculation of benchmarks used in the less than adequate remuneration programs, which noted

specifically and on two separate instances that "imports are valued on a CIF basis and exports on

a FOB basis."  GTC Second Benchmark Submission, J.A. Tab 19 attach. 4 n. 2.1.1, 2.4.1.  It is

puzzling how Commerce concluded that there was no evidence indicating that the import prices

were CIF inclusive, if Commerce judiciously reviewed the record before it.

Putting aside the substantive issue of whether Chinese import statistics *are* reported on a

CIF basis—therefore rendering the ocean freight costs duplicative in the benchmark

calculations—the Department is required by the "substantial evidence" analysis to consider all of

the evidence in the record in order to make a reasonable determination on the merits.  Indeed,

"substantial evidence 'means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion,'" which also includes consideration of "whatever in the record

fairly detracts from its weight."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed.

Cir. 2016).  Certainly, evidence in the record demonstrating that imports may be valued on a CIF

basis would detract from the Department's ultimate decision to include ocean freight costs to the

nylon cord benchmark.  Based on its explanations, Commerce clearly declined to consider—and

made no mention of—this evidence.  The court cannot sustain the Department's decision to turn

a blind eye on evidence that is entirely pertinent to its ultimate conclusion.

In light of this evidence having been placed on the record and properly raised before the

Department, Commerce has unreasonably concluded that there was "no[] . . . information on the

record that indicates these Chinese import statistics are reported on a CIF basis."  I&D Mem. at

15.  The court orders Commerce to review the record in its totality, including evidence submitted

by Guizhou, in order to come to a reasonable conclusion; until then, the Department's decision to

include ocean freight is not supported by substantial evidence and must be remanded for further

consideration.

### IV.    The VAT and the Import Duty Exemption for Imported Raw Materials Program

As it explained in its *Amended Final Results*, the Department concluded that the import

duty exemptions and VAT exemptions on imports of raw materials—under the VAT and Import

Duty Exemption for Imported Raw Materials Program—were countervailable subsidies.  This

determination was reasonable and supported by substantial evidence drawn from the record.

Pursuant to 19 C.F.R. § 351.519(a)(1)(ii), "a benefit exists to the extent that the

exemption extends to inputs that are not consumed in the production of the exported product."

In analyzing whether a program for exemption of import charges upon export results in a

countervailable benefit, Commerce must consider whether the government in question

"maintains controls adequate to ensure that any remission or exemption of import duties does not

extend to duties on inputs not consumed in production for export."  *GGB Bearing Tech. (Suzhou)*

*Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1233, 1241–42 (2017).   Commerce will

consider the entire amount of an exemption to confer a benefit unless the government has a

specifically delineated procedure "to confirm which inputs are consumed in the production of the

exported products and in what amounts, and the system or procedure is reasonable, effective for

the purposes intended, and is based on generally accepted commercial practices in the country of

export."  19 C.F.R. § 351.519(a)(4)(i).  Based on this framework, Commerce determined that the

import duty and VAT exemptions were specific and provided a financial contribution sufficient

to countervail the import duty aspect of the program.

Plaintiffs argue that GTC has "placed sufficient information on the record to demonstrate

either that the system in place was reasonable or that its actual consumption was verified by the

GOC," referring to the Processing Trade Goods Handbook and a Customs verification process

that allegedly reviews GTC's accounting books and records "including unit consumptions."  Pls.'

Br. at 34.  GTC further contends that at the time of its First Supplemental Response, GTC was

"in the process of providing actual consumption figures to customs," *id.* at 35, and that

Commerce "ignored all information submitted by GTC in making its determination under 19

C.F.R. § 351.519(a)(4) that the GOC did not have an effective system in place to ensure that

[the] exempted imported inputs were not used in [the] exported product," *id.* at 32.

   The court does not find merit in Plaintiffs' arguments that Commerce failed to consider

all record evidence before concluding that the program provided countervailable benefits.  In

accordance with 19 C.F.R. § 351.519(a)(4)(i), Commerce examined whether the Government of

China had a defined and reasonable procedure to confirm which inputs, and in what amounts, are

consumed in the production of the exported products.  After its review, Commerce found that the

GOC did not have an effective system in place to qualify for a valid exception, based on the fact

that the GOC failed to explain "how it determined the quantity of material . . . consumed in the

production process and to provide sample documentation or reports to support its explanation."

I&D Mem. at 19.  Indeed, the GOC provided generic responses to Commerce's questions

concerning consumed materials in the OTR tires production, and referred generally to Customs

Measures and the Processing Trade Goods handbook, while utterly neglecting to provide specific

details on *how* the GOC determined the quantity of rubber, nylon cord, and carbon black

consumed in the production process.  *See* GOC Initial Questionnaire Resp. at 59.

   Guizhou's argument that Commerce failed to consider GTC's responses—in lieu of the

GOC's— when reviewing the record fares no better.  First, Commerce is entitled to focus on the

GOC's responses in light of the fact that its regulations specifically require that the Department

determine that the "*government* in question has in place and applies" the appropriate procedure

confirming which inputs are consumed in the production and in what amounts.  19 C.F.R. §

351.519(a)(4)(i) (emphasis added).  Moreover, GTC's responses still fail to show that the

Department's determination that the program provided countervailable benefits and failed to

meet the exception requirements under § 351.519(a)(4) was either unreasonable or unsupported

by substantial evidence.  Responding to the Department's question about how the quantity of the

material was consumed in the production, GTC similarly described the basic material

consumption process but neglected to detail specifically how it initially determined the quantity

of rubber, nylon cord, or carbon black consumed in the production of tires by Guizhou.  GTC

Initial Questionnaire Resp. at 12; GTC First Supp. Resp. at 27.

    The Department calls attention to this flaw, evident in both the GOC's and GTC's

questionnaire responses, when it concluded that the GOC failed to show that "it *applied* the

process outlined in the Customs Measures and Measures of Unit Consumption," a step necessary

to determine the quantity of rubber, nylon cord, and carbon black actually consumed in the

production.   I&D Mem. at 20 (emphasis supplied).  Therefore, the Department concluded, the

GOC failed to provide a sufficient basis for non-countervailability under the regulation.  *Id*.

    The court agrees.  To its credit, GTC does provide a cursory reference to the standard

procedure it must undergo in order to verify input consumption to the GOC; however, the

analysis and corresponding documentation fall short of demonstrating that the GOC maintains a

process to verify GTC's actual consumption of rubber, nylon cord, or carbon black for the

production of tires by Guizhou or other tire producers.  GTC Initial Questionnaire Resp. at 12,

16, Exs. II.E.1, II.E.2; GTC First Supp. Resp. at 27.  For example, in response to a supplemental

questionnaire requesting a "*detailed* explanation of *how* the documents provided at Exhibit II.E.1

establish the quantity of imported material consumed in the production process and in the

production of exports in particular"—that is, the core of a 19 C.F.R. § 351.519 analysis—

Guizhou responded merely that "[t]he quantity and value of imported material listed in Exhibit

II.E.1]]" were GTC estimates, and that the "actual quantity of imported material can be

determined based on Exhibit II.E.2." [2]  GTC First Supp. Resp. at 27.   Devoting little airtime to

any semblance of a detailed explanation of the government system in place, Guizhou directs

Commerce instead to Exhibit II.E.2, a VAT and Import Tariff Exemptions Table detailing the

imported materials during the POR.  Though that may be part of the regulatory analysis, the

underlying concern is whether the government maintains and applies a consistent procedure in

order to confirm the inputs consumed in the production.  The results—provided by Guizhou in

Exhibit II.E.2—are just business records listing the outputs of the system in question.

All in all, Commerce's review of the record evidence was reasonable and its decision to

countervail the VAT and the Import Duty Exemption for Imported Raw Materials Program is

supported by substantial evidence that the court will not now disturb.

**V.      Voluntary Remand of VAT**

Although no longer in dispute, Commerce did calculate a 17 percent VAT rate on imports

of natural and synthetic rubber.  Prelim. Results Calculations 9, J.A. Tab 26 (Oct. 5, 2016)

---

[2] Moreover, GTC argues that Commerce failed to notify the GOC of a deficiency in its response
and that the failure to do so "was contrary to law," given the Department's "statutory obligation
to inform parties of deficiencies in their submission[s] to permit them an opportunity to cure
those deficiencies."  Pls.' Br. at 30.  This characterization of the record also misses the mark.
Contrary to GTC's contention, Commerce did not find a gap in neither the GTC's nor the GOC's
responses.  Rather, the Department considered the evidence presented on the record and
concluded that the parties failed to demonstrate that *the GOC* maintained (and applied) a specific
procedure to determine the quantity of rubber, nylon cord, or carbon black consumed.

(unchanged in *Final Results*).  Because the parties are in agreement, the court remands to
Commerce for further consideration of this issue.

   Without admitting error, as here, Commerce "may request a remand . . . in order to
reconsider its previous position" by "simply stat[ing] that it ha[s] doubts about the correctness of
its decision," and if the agency's concern is substantial and legitimate, a remand is usually
appropriate.  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  Commerce's
concerns are considered substantial and legitimate when "(1) Commerce has a compelling
justification for the remand, (2) the justification for remand is not outweighed by the need for
finality, and (3) the scope of the remand is appropriate."  *Timken Co. v. United States*, Slip Op.
14-51, 2014 WL 1760033, at *3 (2014) (citing *Ad Hoc Shrimp Trade Action Comm. v. United
States*, 37 CIT __, __, 882 F. Supp. 2d 1377, 1381 (2013)).  However, "if the Government's
request for a remand 'is frivolous or in bad faith,' the court may deny the remand."  *SeAH Steel
VINA Corp., v. United States*, 40 CIT __, __, 182 F. Supp. 3d 1316, 1333 (2016) (citing *SKF
USA Inc.*, 254 F.3d at 1029).

   Plaintiffs argue that the Department should revise its calculations for the VAT and Import
Duty Exemption for Imported Raw Materials Program to account for two errors in Commerce's
benefit calculation.  Pls.' Br. at 36.  To that end, the Department requests that the Court grant a
voluntary remand regarding the program in order to reconsider the two aspects of the *ad valorem*
rate calculation identified by Guizhou.  Def.'s Br. at 45.

   The Court finds no evidence of frivolousness in the Department's request for a voluntary
remand on this issue.  Indeed, there are two limited and compelling grounds for a remand that
both Guizhou and Commerce have recognized.  First, the Department notes that the VAT export
rebate rate should have been reduced by 9 percent—bringing the VAT export rebate rate down to

8 percent instead of the originally identified 17 percent—to account for the rebate of VAT for

OTR tires.  *Id*.  Second, the Department requests reconsideration of the proper sales denominator

used to calculate the *ad valorem* rate for the program.  *Id*. at 46.  Guizhou argues—and

Commerce agrees—that the "export sales only denominator" that was used to calculate the *ad

valorem* rate in Commerce's *Final Results* is in error because Commerce has already previously

found that the benefit for this program is used for *both* export and domestic sales.  Pls.' Br. at 38;

Def.'s Br. at 45.  Commerce acknowledges that it "did not fully address the[se] arguments raised

by Guizhou in its brief" and requests a remand, without admitting error, in order to "obviate the

need for the Court to rule on an issue that Commerce itself wishes to reconsider."  Def.'s Br. at

46.  Furthermore, the interest in protecting the administrative proceeding from material

inaccuracies is not outweighed by a need for finality because the court has already concluded

that several issues are in need of reconsideration by the Department, thereby mooting any

concerns over finality. Because Commerce presented undisputed and compelling justifications

for remand that are not outweighed by the (now moot) need for finality, Commerce's request for

a voluntary remand to reconsider its determinations regarding the VAT program is granted.  On

remand, Commerce is to review its decision to issue a 17 percent VAT export rebate rate in light

of the fact that there is generally a 9 percent rate of VAT for OTR tires; and Commerce may

reconsider its calculations when attributing the subsidy benefit only to export sales.

**CONCLUSION**

The court sustains the Department's decision to countervail the Import Duty Exemption for Imported Raw Materials Program, but grants the Department's request for voluntary remand to reconsider the VAT export rebate rate and the *ad valorem* rate for the Program.  The court also sustains the Department's selection of quarterly benchmark data in its LTAR calculations, and finds that the Department did not act unreasonably when it included VAT and import duties in the benchmark calculations for synthetic rubber and carbon black.

However, the Department's decision to apply AFA regarding China's Export-Import Bank Buyer's Credit Program was unreasonable because material information was not missing from the record.  The GOC had provided sufficient responses to the Department's questionnaires reflecting non-use of the Program, and the Department's AFA determination to the contrary was not supported by substantial evidence.  The court also finds that the Department's decision to include ocean freight costs in its nylon cord Tier 1 benchmark calculations was not supported by substantial evidence because the Department failed to consider evidence demonstrating that Chinese imports are already freight inclusive; on remand, the court orders the Department to consider the evidence submitted by the parties to determine whether ocean freight costs would be duplicative to its benchmark calculations.

For the foregoing reasons, after careful review of all papers, it is hereby

**ORDERED** that the Department reconsider its decision to apply AFA as to China's Export Import Bank Buyer's Credit Program, taking into account the GOC's evidence of non-use, as in accordance with the Opinion and Order; it is further

**ORDERED** that the Department consider the evidence submitted by GTC as to the ocean freight costs for the nylon cord benchmarks and apply its analysis to the Department's redetermination as in accordance with the Opinion and Order; and it is further

**ORDERED** that the Department review on remand its VAT export rebate rate calculation as well as the proper sales denominator used to calculate the *ad valorem* rate for the VAT and Import Duty Exemption for Imported Raw Materials Program; it is further

**ORDERED** that all other challenged determinations of Commerce are sustained; and it is further;

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  October 17, 2018
New York, New York